## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Bankruptcy No. 19-22715-CMB |
| 5171 CAMPBELLS LAND CO., INC., | Chapter 11 |
| Debtor. |  |
| ROBERT S. BERNSTEIN, as Plan Administrator for the Creditors Trust under the Debtor's confirmed Plan, |  |
|  | Adversary No. 21-2063-CMB |
| Plaintiff, |  |
| v. | Related to Doc. No. 179 |
| MEYER, UNKOVIC & SCOTT LLP, a Pennsylvania Limited Liability General Partnership, and ROBERT E. DAUER, JR., an individual, |  |
| Defendants. |  |

*Appearances*: Bethann Lloyd, Esq., and Holly Whalen, Esq., for Movants/Defendants
David Cimo, Esq., and Marilee Mark, Esq., for Respondent/Plaintiff

### MEMORANDUM OPINION

The dispute in this adversary proceeding centers on whether the law firm of Meyer, Unkovic & Scott LLP and Attorney Robert E. Dauer, Jr. (together, "Defendants") failed to meet the applicable professional standards in the representation of 5171 Campbells Land Co., Inc. (hereinafter "Debtor" or the "Company") in its prepetition endeavors resulting in damages to the Company. Following an extensive period of discovery, Defendants contend that the undisputed evidence cannot support the allegations of malpractice. As such, Defendants filed the pending *Motion for Summary Judgment* ("Motion," Doc. No. 179), which is opposed by Plaintiff, a plan

1

administrator. Following the filing of their respective statements of material fact, responses thereto, briefing, and oral argument, this Court finds the Motion must be granted in part and denied in part.

Background & Procedural History

For a relatively brief period of approximately eighteen months prior to the commencement of the bankruptcy case, the Company operated "Perkins Restaurant and Bakery" branded restaurants (the "Perkins Franchise Chain"). On July 8, 2019, the Company filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. In the course of the bankruptcy case, *Debtor's Chapter 11 Plan of Liquidation Dated November 12, 2019*, was confirmed by Order dated March 18, 2020, and Robert S. Bernstein (the "Plan Administrator") was appointed to conduct an orderly liquidation of the Debtor's assets, including the prosecution of litigation.

Pursuant to that authority, this adversary proceeding was commenced by the Plan Administrator on July 6, 2021, alleging legal malpractice with respect to Defendants' pre-petition representation of the Company. The Complaint consists of two counts. In Count I, the Plan Administrator alleges legal malpractice/professional negligence against both Defendants. Count II asserts a claim of vicarious liability against the law firm based on the conduct of its authorized agent, Attorney Dauer. According to the Complaint, Defendants provided inadequate legal advice leading up to and following the Company's acquisition of the Perkins Franchise Chain. Specifically, the Plan Administrator asserts that Defendants failed to fully and properly advise the Company with respect to the material aspects, terms, and risks of the components of the overall transaction, resulting in the Company's inability to make reasonably informed business decisions and ultimately the Company's inability to fully perform its contractual duties under various agreements. *See* Compl. at ¶¶5-6. Following the acquisition, the Plan Administrator alleges that

2

the Defendants failed to timely provide insolvency advice to the Company. *See id.* at ¶7. In addition, the Plan Administrator contends that Defendants' conduct reflected loyalty to the Company's president, William T. Kane (hereinafter, "Billy Kane"),[1] instead of the client, which was the Company. *See id.* at ¶8. The factual allegations span approximately thirty pages within the Complaint and form the basis for the seventeen identified breaches of professional duties in Count I. *See id.* at ¶112(a)-(q).

Initially, Defendants sought dismissal of the adversary proceeding alleging the action was untimely. By Memorandum Opinion and Order entered July 25, 2022, this Court denied Defendants' motion to dismiss, holding that the extension under 11 U.S.C. §108 applies to the Plan Administrator. Thereafter, Defendants filed an answer, denying all allegations of negligence, and asserting affirmative defenses.[2] The parties then proceeded to a lengthy period of discovery. Defendants now contend that summary judgment in their favor is appropriate.

Jurisdiction

As determined by the District Court, this adversary proceeding is non-core;[3] therefore, this Court exercises "related to" jurisdiction pursuant to 28 U.S.C. §§157 and 1334. As provided in 28 U.S.C. §157(c)(1), a bankruptcy judge may hear a non-core proceeding; however, any final order or judgment must be entered by the District Court. Nonetheless, this Court has authority to enter

---

[1]    Throughout the filings, Mr. William Kane is consistently referred to as "Billy," and the Court will follow suit. In addition, as another member of the Kane family played a prominent role in the underlying facts, the Court will refer to each of them by first and last name for clarity.

[2]    Also pending is the *Motion of Plaintiff Plan Administrator Robert S. Bernstein for Partial Summary Judgment and/or for Judgment on the Pleadings on Certain Affirmative Defenses Asserted by Defendants and Request for Judicial Notice* (Doc. No. 186). That motion will be taken under advisement at this time. Following resolution of the Plan Administrator's motion, the Court anticipates that this proceeding will be trial ready such that the reference will be withdrawn for that purpose.

[3]    *See* District Court's Memorandum Opinion (Doc. No. 220) at 4 ("As a preliminary matter, the Court concludes -- and the parties agree -- that the Adversary Proceeding involves a non-core proceeding."). The District Court determined that the reference will be withdrawn for the purpose of trial. Therefore, this Court presides only over the pretrial aspects of this adversary proceeding.

interlocutory orders which do not constitute a final adjudication.[4] To the extent the District Court finds this Court lacks the authority to enter such an order, this Memorandum Opinion and the accompanying Order constitute this Court's proposed findings and conclusions.[5]

<u>Legal Standard</u>

Pursuant to Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying this familiar standard, a factual dispute is considered "material" where it may affect the outcome of the case under applicable law, and a dispute is "genuine" where the identified evidence "could permit a reasonable jury to decide in favor of the nonmoving party." *See Steidle v. United States Liab. Ins. Co.*, 179 F.4th 193, 202 (3d Cir. 2026)(footnotes omitted). Significantly, in considering a motion for summary judgment, the Court is "view[ing] the facts in the light most favorable to the non-moving party and [drawing] all reasonable inferences in that party's favor." *See Steidle*, 179 F.4th at 202 (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). With this standard in mind, the Court considers the Defendants' Motion.

---

[4] *See Gavin/Solomonese LLC v. Blue Water Sponsor, LLC (In re Clarus Therapeutics Holdings, Inc.)*, No. 24-50125 (MFW), 2026 WL 97759, at *2 & n.20, 2026 Bankr. LEXIS 68, at *5-6 & n.20 (Bankr.D.Del. Jan. 13, 2026). Here, the Court does not resolve the adversary proceeding. The result is an interlocutory order, not a final order. *See Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 228 (3d Cir. 2019)(identifying partial grants of summary judgment as interlocutory orders); *Natale v. French & Pickering Creeks Conservation Trust, Inc. (In re Natale)*, 295 F.3d 375, 380 (3d Cir. 2002)(finding an order would not be considered final when it did not resolve all issues within the adversary proceeding); 28 U.S.C. §158(a) (distinguishing a final judgment from interlocutory orders).

[5] As also observed in *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, the distinction appears to have no impact on the District Court's review as a decision granting summary judgment is subject to *de novo* review regardless. *See* No. 22-50439 (CTG), 2023 WL 6938144, at *5 n.41, 2023 Bankr. LEXIS 2584, at *16 n.41 (Bankr.D.Del. Oct. 19, 2023).

Factual Background

In this case, even the most basic information is convoluted.[6] During the relevant timeframe, the number of shareholders in the Company is disputed. Defendants cite to a *Consent by Shareholders and Directors* dated January 2, 2018 (the "Shareholders Consent"), as evidence of four shareholders: Billy Kane; Kristine "Krissy" Kochis; Timothy Weaver; and L-Four, a family trust of which Dr. Ronald Linaburg ("Linaburg") is the managing member. *See* Defs.' Ex. 8; Doc. No. 235 at ¶15; Doc. No. 250 at ¶11. However, the Plan Administrator points to contrary evidence that the shareholders were only Billy Kane and L-Four, each holding a fifty-percent interest in the Company. *See* Pl.'s Ex. 1 at ¶¶18-20;[7] Pl.'s Ex. 5.[8] *See also* Defs.' Ex. 6 at 8, 67, 407; Defs.' Ex. 10; Defs.' Ex. 51. As is seen throughout this record, there is inconsistent evidence on this point, which will not be resolved on summary judgment. *See* Defs.' Ex. 16 at MUS 9266-67; Defs.' Ex.

---

[6]    This is evident from a review of each party's response to the other's statement of material facts. As applicable to a particular fact, the Court cites herein to *Plaintiff's Responsive Concise Statement of Material Facts* (Doc. No. 235) and *Defendants' Response to Plaintiff's Concise Statement of Material Facts* (Doc. No. 250).

[7]    Plaintiff's Exhibit 1 is a Declaration provided by Linaburg. While Defendants initially sought to exclude this Declaration from consideration, as revealed at oral argument, Defendants' argument went more to the "weight" which should be given to the Declaration. *See* Audio of Oral Argument held May 19, 2026 (hereinafter "Oral Argument") at 12:04-12:05 P.M. As the Court does not weigh evidence at summary judgment, the Court will consider the Declaration without further comment on this point. The assessment of Linaburg's credibility is a matter for trial. Related to this attempt to essentially discredit Linaburg as a witness in this proceeding, Defendants point to his deposition testimony that he was no longer interested in reading all of the emails that were being sent related to the acquisition of the Perkins Franchise Chain. The Plan Administrator argues that this does not equate to a statement that Linaburg did not otherwise expect to be kept informed and advised. A jury may draw certain conclusions from Linaburg's alleged inattentiveness as Defendants seem to argue; however, that is not a matter for this Court at this time. Applying the applicable standard at this stage, the Court construes the evidence in the light most favorable to the non-moving party and does not weigh the evidence.

[8]    Notably, in a *Consent by Shareholders and Directors* signed just weeks later than that cited by Defendants, only Billy Kane and L-Four signed as shareholders. *See* Pl.'s Ex. 5 (representing that "the undersigned are all of the shareholders and Directors of the Corporation"). Neither party specifically alleges that the reason for this incongruity is a change during the period of time between the execution of these documents.

44 at 4; Defs.' Ex. 89 at 18, 67, 144. Ultimately, the dispute appears to boil down to who exercised control and decision-making authority for the Company.

With respect to the identification of the so-called "decisionmakers" for the Company, that too is unclear and disputed. *See* Doc. No. 250 at ¶8; Defs.' Ex. 11 at 182. Leading up to the acquisition of the Perkins Franchise Chain, at least some evidence indicates that Billy Kane and Linaburg were viewed as the decisionmakers. *See* Pl.'s Ex. 6 at 21; Defs.' Ex. 33.[9] It is undisputed, however, that Billy Kane served as the Company's president while Linaburg was the Company's vice president. *See* Doc. No. 235 at ¶¶18-19. Notably, Linaburg made significant financial contributions to the Company. *Id.* at ¶20. It is also he (through L-Four) who is funding this litigation pursuant to a Litigation Funding and Assignment Agreement ("Funding Agreement") with the Plan Administrator. *See* Doc. No. 235 at ¶223; Defs.' Ex. 83.[10]

Many of the relevant facts center on Defendants' representation of the Company leading up to the acquisition of the Perkins Franchise Chain. The Company needed to secure restaurant properties; obtain approval to become a franchisee for each location; and purchase the existing furniture, fixtures, and equipment in the restaurants. *See* Doc. No. 235 at ¶25. In more detail, these interrelated transactions (collectively, the "Perkins Franchise Transaction") involved the following:

(1) The purchase of real estate from certain entities referred to collectively herein as "Spirit;"[11]

---

[9]     The email dated December 31, 2017, to Billy Kane and Linaburg states, "this is your deal, Gentlemen, so you decide."

[10]     As pointed out by Defendants, Linaburg provided the verification for the Complaint and, through L-Four, stands to recover between 85% and 99% if the Plan Administrator prevails in this proceeding. *See* Doc. No. 235 at ¶¶224-25.

[11]     These entities have been identified as follows: Spirit Master Funding, LLC; Spirit Master Funding III, LLC; Spirit Master Funding IV, LLC; Spirit Master Funding V, LLC; Spirit Finance Acquisitions, LLC; and/or its assigns or affiliated entities.

(2) Several agreements with entities collectively referred to herein as "Store,"[12] including a sale-leaseback transaction and certain financing transactions;

(3) The acquisition of the right to operate as a franchisee through license agreements with Perkins & Marie Callender's, LLC ("Perkins"); and

(4) The purchase of assets and assumption of certain liabilities from Unique Ventures Group, LLC ("UVG"), a debtor in a Chapter 11 bankruptcy case, through an Asset Purchase Agreement ("APA").[13]

*See* Doc. No. 250 at ¶12. As these were interrelated transactions, it is helpful to understand that actions were being taken contemporaneously to move forward toward the goal of acquisition.

The proceedings and particularly the bid procedures in the UVG bankruptcy case provide some context in this regard. *See* Defs.' Ex. 38 ("Bid Procedures"). In implementing the Bid Procedures on November 21, 2017, the Court set forth the process by which the assets of UVG would be sold at auction on January 9, 2018. These procedures demonstrate the interrelated pieces to the overall transaction. Among other things, a qualified bid would satisfy the following requirements and be submitted by the bid deadline:

   i.    Include an executed and binding APA along with a list of leases and contracts (such as license agreements) to be assumed and assigned in connection with the sale with a commitment to pay associated cure costs;

   ii.    Include a commitment to operate as Perkins restaurants and provide evidence of license approval to do so;

   iii.    To the extent applicable to a particular bid, provide evidence of a commitment with Spirt regarding any assumed contracts to which Spirit is a party;

   iv.    Contain evidence of financing or access to funds to reasonably allow a determination as to the capability to consummate the transaction;

   v.    Provide that the written offer is irrevocable until sale closing if determined to be the successful bidder;

   vi.    Not contain any due diligence or financing contingencies or provide that any and all contingencies would be satisfied or waived on or before the bid deadline;

   vii.    Provide evidence of authorization from a bidder's board of directors or governing body with respect to the purchase agreement;

   viii.    Provide for a closing date no later than January 31, 2018.

---

[12]    The Store entities consist of Store Master Funding XIII, LLC and Store Capital Acquisitions, LLC.

[13]    In 2017, assets such as furniture, fixtures, and equipment were owned by UVG. *See* Doc. No. 235 at ¶44. The UVG bankruptcy case was pending in the Western District of Pennsylvania at Case No. 17-20526 and was presided over by the Honorable Thomas P. Agresti.

*See* Bid Procedures at 3-5. On or before December 19, 2017, any potential bidder was required to seek licensor approval to operate as Perkins restaurants and make certain commitments with respect thereto, including the commitment to complete the upgrade and modernization of the restaurants. *See* Bid Procedures at 6-7. In setting forth the "as is, where is" nature of the sale, the Bid Procedures advised as follows:

> Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and inspection of any documents and/or the Assets in making its Qualified Bid[.]

*See* Bid Procedures at 9. These procedures serve as a backdrop for the events that unfolded.

In pursuit of the acquisition, there was a team involved on behalf of the Company, including Frank Kane and Edward "Ted" Peters ("Peters"). Billy Kane enlisted the assistance of his brother, Frank Kane, a self-described turnaround specialist whose strength was in financing. *See* Doc. No. 235 at ¶¶5-6. Peters also joined as an experienced financial consultant. *See* Doc. No. 235 at ¶¶7-8. Attorney Dauer, who had previously served as the Company's outside legal counsel, represented the Company in *at least* some aspects related to the acquisition.[14] In November 2017, efforts were made by Frank Kane to divide up tasks among various individuals. *See* Defs.' Ex. 22. Different members of the team served different roles. With respect to Attorney Dauer, Frank Kane observed that he was not attempting to list legal topics as Attorney Dauer would know what legal activities were required. *See* Defs.' Ex. 22; Defs.' Ex. 3 at 232. Nonetheless, Attorney Dauer was not responsible for certain tasks, such as financial planning or evaluating capital needs of the Company. *See* Doc. No. 235 at ¶¶33, 36, 38-39. Leading up to the bankruptcy auction, the Company, through its team, worked on the various pieces of the Perkins Franchise Transaction.

---

[14]    The scope of his engagement is subject to dispute. *See* Doc. No. 250 at ¶¶1-5.

One item the Company had to complete was due diligence with respect to the facilities it was seeking to acquire. There is no evidence that anyone within the Company had experience or expertise in inspections of this type.[15] Nonetheless, the Company handled the inspections internally without the assistance of outside professionals. *See* Defs.' Ex. 1 at 211-12; Defs.' Ex. 6 at 94.[16] According to Billy Kane, capital improvement lists were made during this period, and the inspections revealed "the full extent" of what the Company was getting into with the facilities. *See* Defs.' Ex. 1 at 211-12. Linaburg, however, asserts that the extent of capital improvements and construction needs only came to light after closing. *See* Pl.'s Ex. 1 at ¶38.[17] Peters' testimony is consistent with Linaburg's position. *See* Defs.' Ex. 4 at 45 (testifying that the inspections were probably not completed "in the detail that was required"). As for Defendants, it appears to be uncontested that they did not advise the Company to retain qualified professionals for the purpose of these inspections; however, it is also clear that they disavow any obligation to do so. *See* Doc. No. 250 at ¶¶66-67, 73.

Another important step for the Company was to secure franchisee status. On December 14, 2017, Attorney Dauer submitted the Company's franchise application to Perkins. *See* Defs.' Ex. 16. The application provides insight into the Company's plan and significantly its reliance on two letters of intent. *See* Defs.' Ex. 16 at MUS 9210-15 (hereinafter "Letters of Intent"). Within the

---

[15]     While it is undisputed that Peters and Frank Kane had experience with *financial* due diligence, there is no evidence of their expertise or experience with respect to the physical inspection of the restaurants. *See* Defs.' Ex. 1 at 242; Doc. No. 235 at ¶48.

[16]     As evidence of the somewhat clumsy and amateur efforts, an incident occurred in November 2017, in which the bankruptcy trustee accused the Company's representatives of being disruptive in their inspections. *See* Defs.' Exs. 28 and 29.

[17]     Defendants make much of Linaburg's testimony that he was not paying attention to due diligence during this timeframe though his stated reason for this was his understanding that it was being handled by professionals. *See* Defs.' Ex. 6 at 85. Regardless, the Court finds this of little impact on the ultimate question of whether Defendants had a duty to advise the Company of a potential need to retain qualified professionals for the inspections.

9

application, a section designated as "Business Plan and Economic Model" addresses financial

viability as follows:[18]

> Critical to the ongoing success of the group of 28 Perkins Restaurants is financial viability…. The Campbell plan is based on a signed Letter of Intent from a finance provider….The Letter of Intent provides sufficient capital to cover the Campbell commitment in the Asset Purchase Agreement filed with the Bankruptcy Court. A 'hard commitment' for this financing is expected in December. The refinancing of ownership of the 28 stores reduces rent by more than $1 million annually, which can be re-invested in the stores, employees and communities.
>
> Additionally, critical to the financial viability of the 28 Perkins Restaurants, is a remodeling program. Campbell has a Letter of Intent for financing for a complete remodeling of all 28 stores for $8 million[.]

See Defs.' Ex. 16 at MUS 9196-98. Ultimately, Perkins approved the Company's application and

licensed twenty-eight restaurants, clearing a necessary hurdle and moving the Company a step

closer to its desired acquisition of the Perkins Franchise Chain. See Doc. No. 235 at ¶43.

Central to these proceedings is how the Company intended to fund the acquisition and

capitalize the business. In order to secure the restaurant properties from Spirit, the Company sought

financing from Store. See Doc. No. 235 at ¶26. Store, unlike a traditional bank lender, is a real

estate company that purchases real estate and then leases it back to the borrower. Id. at ¶27. By

doing so, Store owns the real estate and can fund up to 100% of the value. Id. In addition, Store

had the ability to close a deal quickly and fund future improvements. Id. Leading up to the

acquisition, Store provided the Company with two non-binding Letters of Intent dated October 2,

2017, one regarding a sale-leaseback transaction and another regarding $8 million in financing, as

provided in the franchise application. Significantly, neither these Letters of Intent nor any

---

[18]    As set forth in the terms of the Bid Procedures regarding "Licensor Approval," among the outlined requirements is the following: "The Licensor must approve the material terms and conditions of the Qualified Bid _and the Potential Bidder's business plan_, including the Licensor's good faith determination that the price and terms of payment are not so burdensome and the Potential Bidder's capital structure is not so leveraged as to adversely affect the subsequent operations and updates of the restaurants following sale." See Bid Procedures at 7 (emphasis added).

subsequent modifications leading up to the auction make reference to a security deposit or a credit enhancement. *See* Doc. No. 250 at ¶¶23-24. The absence of these terms plays heavily into future events.

According to Linaburg, the Company's objective was for the deal to be capitalized *solely* from the difference between the price paid by the Company for the real estate from Spirit and the funds from the sale-leaseback transaction with Store. *See* Pl.'s Ex. 1 at ¶¶24-25; Pl.'s Ex. 16 at 44-45, 571-73. As further described by Linaburg, the proceeds from the sale-leaseback transaction would be used to satisfy the Company's obligations under the APA and to provide adequate working capital with an additional $8 million in forward financing provided by Store for certain capital expenditures and leasehold improvements. *See* Pl.'s Ex. 1 at ¶¶24-25; Pl.'s Ex. 16 at 44-45, 571-73. A critical component of the objective described by Linaburg is that no additional capital or financial contributions or obligations would be required to close on the Perkins Franchise Transaction. *See* Pl.'s Ex. 1 at ¶¶22-25, 34; Pl.'s Ex. 16 at 43.[19] With respect to Linaburg's description of the Company's general objective, there does not appear to be directly conflicting evidence in the record;[20] however, regardless of the Company's goal or intentions, it is undisputed that the terms ultimately reached with Store did not fulfill the objective as described.

---

[19]   Although Defendants appear to challenge Linaburg's statements on these points due to his deposition testimony that he was not involved in conversations with Store in 2017, the Court does not find that his lack of direct communication with Store would preclude him from knowing about the Letters of Intent or the Company's objective with respect thereto.

[20]   Per the testimony of Peters, "[t]hey were buying the company without putting any money in, and obviously if you don't put any money in, you've got to scratch to see how you're going to finance it." *See* Defs.' Ex. 4 at 17. *See also id.* at 13 (testifying "that the acquisition supposedly was going to be financed by STORE Capital and there was going to be almost zero money coming in from any other place"). Defendants admit only that, during the planning stage, the Company intended to put as little as possible into upfront capital. *See* Doc. No. 235 at ¶9; Doc. No. 250 at ¶10. Defendants point to the testimony of Frank Kane to support the contention that contributions from the principals were expected. However, the cited testimony does not appear to state anything more than his opinion that "it's very rare to be able to do any kind of deal without any kind of commitment personally from the principals." *See* Defs.' Ex. 87 at 111. At the most, it suggests a factual dispute for trial regarding the Company's objective. At this stage, the Court views the evidence in the light most favorable to the non-moving party.

11

With respect to negotiations with Store, Frank Kane was undisputedly involved with arranging the financing. *See* Doc. No. 235 at ¶29. Prior to the Court's bid deadline, he was pushing for a "hard commitment" from Store. *See* Defs.' Ex. 40.[21] Emails from Frank Kane to Billy Kane and Linaburg on December 31, 2017, and January 1, 2018, demonstrate the lack of a binding commitment to that point. *See* Doc. No. 235 at ¶63; Defs.' Ex. 3 at 117; Defs.' Exs. 33 and 34.[22] At least as of his email dated January 3, 2018, Frank Kane voiced his concern that the standard letter from Store was insufficient to evidence a commitment to satisfy Spirit and the bankruptcy court. *See* Defs.' Ex. 41. Communications with Store continued, however, specifically between Michael Bennett ("Bennett") of Store and Attorney Dauer, as evidenced by emails from January 5, 2018, through January 8, 2018, the day before the auction. *See* Pl.'s Ex. 8-10. Particularly significant to this dispute is the "Commitment Letter" that resulted from these communications.

On January 5, 2018, Bennett sent Attorney Dauer an email with the subject line: "STORE – Signed Commitment Letter" and the message "Good luck!!!" *See* Pl.'s Ex. 9. That email was forwarded by Attorney Dauer, without any included explanation, to Billy Kane, Linaburg, and others on the same date. *Id.* The attachment identified itself as a "commitment" though it was not actually binding and advised, in part, as follows:

> **THIS COMMITMENT, THE ATTACHED TERM SHEET AND THE ATTACHED PROPERTY DESCRIPTION ARE BASED UPON INFORMATION SUPPLIED TO STORE BY LESSEE AND ARE SUBJECT TO REVISION BASED UPON, AMONG OTHER THINGS, CHANGES IN MARKET CONDITIONS AND OTHER FACTORS AND ARE NOT, AND**

---

[21]    It is worth mentioning that, throughout the record, certain terminology is used, such as "hard commitment," "firm commitment," or "binding commitment." It appears these terms are used interchangeably. *See* Defs.' Ex. 13 at 132-33. However, the Court cannot state with certainty that the terms meant the same thing to all of those involved or that confusion did not result potentially from the use of this terminology alone.

[22]    Defendants make much of Linaburg's testimony that he was not talking to anyone about the deal over the holidays. *See* Defs.' Ex. 6 at 120-21, 126. Because the negotiations with Store continued beyond this point leading up to the auction, it does not appear that this testimony conclusively establishes any undisputed, material fact for the purpose of resolving this Motion.

12

**SHOULD NOT BE CONSTRUED FOR ANY PURPOSE AS, A COMMITMENT BY STORE TO FUND THE TRANSACTION UNDER THESE OR ANY OTHER TERMS, AND NO SUCH COMMITMENT MAY BE MADE ORALLY BY ANY EMPLOYEE, OFFICER, AGENT OR REPRESENTATIVE OF STORE OR ITS AFFILIATES AND NONE SHOULD BE IMPLIED BASED UPON ANY STATEMENTS BY, OR CONDUCT OF, SUCH PERSONS. ANY TRANSACTION DOCUMENTS, IF EXECUTED, MAY PROVIDE TERMS THAT SUBSTANTIALLY VARY FROM THOSE IN THIS COMMITMENT AND TERM SHEET AND SHALL, IN ADDITION, BE SUBJECT TO ALL CONDITIONS AND REQUIREMENTS SPECIFIED THEREIN, AS WELL AS TO THE ACCURACY OF ALL INFORMATION PROVIDED BY LESSEE TO STORE, INFORMATION OBTAINED THROUGH STORE'S DUE DILIGENCE AND THEN EXISTING MARKET CONDITIONS.**

*See* Pl.'s Ex. 9. Even up to the day before the auction, Attorney Dauer continued to exchange emails with Bennett regarding revisions to the wording of the letter though the above-stated bold language remained in the so-called "Commitment Letter." *See* Pl.'s Ex. 10.[23]

According to Linaburg, Attorney Dauer was aware of the Company's objective and that a binding commitment from Store was needed on the terms set forth in the Letters of Intent such that no additional capital or financial contributions or obligations would be required. *See* Pl.'s Ex. 1 at ¶¶22-23, 26, 34. Defendants dispute these allegations and cite to the testimony of Attorney Dauer for that purpose. *See* Defs.' Ex. 90 at 223-26, 228. However, it is admitted that Attorney Dauer reviewed the Company's prospective business plan, and it was among the information he submitted to Perkins on behalf of the Company. *See* Doc. No. 250 at ¶¶17, 19. The business plan set forth in the application to Perkins is undeniably based on the Letters of Intent and an expectation of "[a] 'hard commitment' for this financing." *See* Defs.' Ex. 16 at MUS 9198. According to Linaburg, he understood from Attorney Dauer that the Commitment Letter was the

---

[23]    While Defendants cite to deposition testimony of a Store representative in support of the conclusion that, based on Store's procedures, it likely would not have been possible to have a binding commitment prior to the auction, that does not answer the question of whether the lack of a commitment was sufficiently relayed to the Company for it to make an informed decision to proceed to bid. *See* Defs.' Ex. 13 at 132-33.

firm commitment consistent with the Letters of Intent. *See* Pl.'s Ex. 1 at ¶¶42, 44, 46-47. Attorney Dauer, however, limits his role to securing a sufficient financing commitment for bid qualification. *See* Defs.' Ex. 90 at 364-65.[24]

Days prior to the auction, Linaburg, on behalf of L-Four, signed the Shareholders Consent[25] authorizing Billy Kane, as president and "Authorized Officer," "to cause the Corporation to consummate the Sale Transaction [with UVG] upon such terms and conditions as the Authorized Officer shall, in his sole discretion, deem necessary or desirable[.]"[26] According to Linaburg, Attorney Dauer did not explain the significance of the document, which he signed only to give authority to proceed with the Company's business plan, and he would not have done so if he understood that there was no firm commitment from Store. *See* Pl.'s Ex. 1 at ¶50. Nonetheless, with the signed Shareholders Consent, approval as a franchisee from Perkins, and the purported financing commitment from Store, Attorney Dauer submitted a bid for UVG's assets on January 5, 2018. *See* Defs.' Ex. 35.

Whether the Company understood that there was no firm commitment from Store at the time of the auction is disputed. The bankruptcy auction was held on January 9, 2018. Billy Kane, Frank Kane, and Linaburg were in attendance with the Company's counsel, Attorney Dauer. *See* Doc. No. 235 at ¶¶75, 78. At the auction, Frank Kane's role was to advise the Company as to its

---

[24]    Notably, in October 2017, Attorney Dauer did appear to consider it his obligation to warn the Company regarding there being no final approval from Store and the lack of a financing contingency. *See* Defs.' Ex. 23 ("Please note that we do not have a financing contingency….To date, we do not have a final approval from Store and I do not know when Store will be taking this to Committee."). *See also* Defs.' Ex. 90 at 226 ("Part of our legal services were to review the transaction documents from STORE Capital.").

[25]    As mentioned earlier, the Shareholders Consent was signed by others as well, including Ms. Kochis. Interestingly, apparently in reference to this document, she had no recollection of signing it but acknowledged the signature was hers. *See* Defs.' Ex. 2 at 126-27. As she explained, "Bill [Kane] would give me a piece of paper, and I would sign it." *Id.* at 126.

[26]    Upon review of the document, it is not entirely clear when it was executed. *See* Defs.' Ex. 8. The document begins by referencing the Asset Purchase Agreement *dated January 4, 2018*, however, the document itself is dated as of *January 2, 2018*, on the signature page. Based on the email included within Defendants' Exhibit 8, it appears Linaburg did not sign and return the document until January 4, 2018.

capacity to bid, and Peters was consulted during the auction regarding whether the Company could increase its bid beyond the agreed value. *See* Doc. No. 235 at ¶¶80-81. Although Attorney Dauer was conferring with the representatives of the Company during bidding, Linaburg asserts that he revoked any authority for Billy Kane to continue bidding as he believed the offer exceeded what the Company could afford even with the anticipated Store funding. *See* Pl.'s Ex. 1 at ¶¶49, 51. That there was any objection by Linaburg is contested by Defendants.[27] Notwithstanding any alleged objection, the Company secured the winning bid by agreeing to provide a $1.75 million letter of credit to the unsecured creditors of UVG. *See* Doc. No. 235 at ¶109. At the conclusion of the auction, the following representations were made on the record:

> MR. DAUER: Yes, Your Honor. We will represent to the court that we do have the financial ability to close this transaction.
> THE COURT: All right. And you're making that representation based upon representations made affirmatively to you by your clients?
> MR. DAUER: I am, Your Honor, both in cash that they have on hand, as well as the financing commitment that they have.

*See* Defs.' Ex. 36 at 81. The "financing commitment" referenced by Attorney Dauer was nothing more than Store's so-called Commitment Letter provided in advance of the auction. *See* Doc. No. 235 at ¶87. Attorney Dauer's testimony explaining his ability to make this representation to the Court based on the January 5, 2018, Commitment Letter is unclear, though his explanation appears to rely in part upon the fact that Bennett, from Store, was also in attendance and conferring with

---

[27] Whether Linaburg gave any instruction to stop bidding is a factual dispute that will not be resolved at this time. When deposed, Linaburg testified that he was not paying attention at the auction but also that he voiced his objection to bidding. *See* Defs.' Ex. 6 at 64, 141. Based on his deposition testimony and Declaration and construing the evidence in the light most favorable to the non-moving party, it is possible to construe Linaburg's account of the auction such that he was generally not paying attention as he was uninformed about what to expect and did not anticipate any action contrary to the business plan but that he did react when the bidding increased beyond what was anticipated. *See* Defs.' Ex. 6 at 64, 66; Pl.'s Ex. 1 at ¶¶37, 39, 49. Accordingly, the Court will not disregard the evidence of his alleged objection to the continued bidding, and resolution of the factual dispute is reserved for trial.

him and the Company representatives. *See* Defs.' Ex. 90 at 283-86, 288, 361-64.[28] Nonetheless, the Commitment Letter was not binding.

What transpired after the auction is characterized differently by the parties; however, it is undisputed that the ultimate terms of the deal with Store *were not* the same as those embodied in the Letters of Intent or Commitment Letter. *See* Doc. No. 250 at ¶51. Store required the Company to provide a credit enhancement of $5 million, in the form of a letter of credit and cash deposit, which was not previously included in the Letters of Intent or the Commitment Letter. *See* Doc. No. 250 at ¶¶23-24, 51; Defs.' Ex. 44 at 33; Defs.' Ex. 75. The Company satisfied this requirement through a $2.5 million letter of credit and a $2.5 million security deposit. *See* Doc. No. 235 at ¶101. With respect to the funds for future remodeling/capital expenditures, Store separately approved only $4.3 million as opposed to the contemplated $8 million. *See* Doc. No. 235 at ¶105; Defs.' Ex. 13 at 89. Notwithstanding these variations from the previous documents, the transaction closed in escrow on January 31, 2018; then closed with the escrow fully released on February 12, 2018. *See* Doc. No. 235 at ¶¶106-07. The Company assumed operations of the restaurants immediately as of the escrow closing. *See* Doc. No. 235 at ¶118.

Shortly thereafter, the Company was once again looking to Store for financing. In March 2018, Attorney Dauer reminded the Company that it had not yet fulfilled its obligation made at the bankruptcy auction to provide a $1.75 million letter of credit to the unsecured creditors of UVG. *See* Doc. No. 235 at ¶¶109-10. In lieu of supplying a letter of credit, in April 2018, the Company borrowed additional funds from Store to satisfy this obligation. *See* Doc. No. 235 at ¶111; Defs.' Ex. 48. The additional loan, at times referred to as the "bridge loan," reduced the amount of funds

---

[28]     Attorney Dauer does not explicitly state that he relied on any representation by Bennett to transform the non-binding letter into a firm commitment nor does it appear that the terms of the Commitment Letter would have permitted Bennett to verbally bind Store at the auction anyway.

available for renovations until it was paid in full. *See* Doc. No. 235 at ¶115; Doc. No. 250 at ¶62. According to Linaburg, Defendants failed to advise the Company regarding the terms and risks of the loan, which had a term of 48 weeks instead of 48 months. *See* Pl.'s Ex. 1 at ¶61. Billy Kane, however, found the terms to be straightforward. *See* Defs.' Ex. 1 at 259. According to Peters, this was one of the larger problems for the Company, "because it was decapitalizing the company right away[.]" *See* Defs.' Ex. 4 at 19.

Another issue facing the Company upon acquisition was the need to comply with the franchise agreements. Pursuant to the agreement with Perkins to acquire franchisee status, the Company began remodeling; however, the sequencing left certain restaurants dark for extended periods of time. *See* Doc. No. 235 at ¶¶138, 140. By paying for improvements utilizing operating funds, the Company was further decapitalized. *Id.* at ¶143. In addition to remodeling requirements, the Company was obligated to comply with certain operating standards and pay royalties and marketing fees as a franchisee. *Id.* at ¶145-47. Perkins required standardization throughout the country with respect to the condition and appearance of the stores, the menu, product offerings, distributors, and suppliers. *Id.* at ¶145.

Unfortunately, both financial and non-financial issues plagued the Company's relationship with Perkins. *Id.* at ¶157. Throughout the Spring of 2018, the Company changed the menu and products and ran unapproved specials contrary Perkins' operating standards. *Id.* at ¶¶159-60. By letter dated April 6, 2018, Perkins warned of financial defaults in addition to ongoing non-financial issues of concern. *Id.* at ¶¶162-64. These issues ultimately led to Perkins sending a thirty-day notice of default letter on May 4, 2018, addressing both financial and non-financial items, and advising that the license agreements would terminate unless all amounts were paid on or before June 5, 2018. *See* Doc. No. 235 at ¶165; Doc. No. 250 at ¶82. Following a meeting in June 2018,

Perkins wrote a letter of understanding to the Company dated June 8, 2018, which served as a temporary license, allowing the Company to continue operating as a Perkins. *See* Doc. No. 235 at ¶¶169-70. Perkins offered some financial concessions in the form of reduced royalties and marketing fees. *Id.* at ¶171. Unfortunately, issues of non-compliance continued, both financial and otherwise, though Perkins did not act to revoke the license immediately and continued to extend additional time. *Id.* at ¶¶172-76.

Despite the difficulties with Perkins, the Company continued to pay rent to Store throughout 2018 and until May 2019. *Id.* at ¶¶195, 209. However, as of May 2019, the Company remained behind on its financial obligations to Perkins, continued to violate Perkins' operational standards, and received a notice of default from Store with respect to its April 2018 note obligation. *Id.* at ¶214-15. In June 2019, the Company missed its first rental payment to Store, and Store commenced a suit against the Company. *See* Doc. No. 235 at ¶216; Doc. No. 250 at ¶94. Also in June 2019, Perkins terminated the Company's license and filed suit against the Company. *See* Doc. No. 235 at ¶217; Doc. No. 250 at ¶93.

There have been various allegations regarding what went wrong. Following the assumption of operations, things did not go according to plan. Although an organizational chart was created pre-acquisition, according to Peters, the individuals designated for certain roles did not necessarily take on those roles, and essentially too many people were doing their own thing. *See* Doc. No. 235 at ¶125; Defs.' Ex. 4 at 36. Although Frank Kane recommended a process to implement new systems and structures to turn the Company around, his recommended change acceleration program did not proceed. *See* Doc. No. 235 at ¶¶122, 124. Further, with respect to financial matters, the Company's financial records proved to be entirely unreliable and inaccurate. *Id.* at ¶¶130-34. However, according to Peters, one of the main problems that sunk the whole investment

18

was that the Company did not receive the total anticipated funds from Store, and it was always assumed that Store would be providing the funds for working capital. *See* Defs.' Ex. 4 at 17, 19-20.[29] Accordingly, varying accounts exist for what caused the Company's ultimate demise.

Prior to the bankruptcy filing, the Company explored other options over the period of time it operated the Perkins Franchise Chain, including a potential stock sale, sale of certain stores, and retention of a restructuring officer. *See* Doc. No. 235 at ¶¶182-183, 185; Defs.' Ex. 1 at 267-68. Billy Kane testified that he was aware of bankruptcy as an option but preferred to pursue these other options first. *See* Defs.' Ex. 1 at 269. However, according to Linaburg, at no time prior to Linaburg's resignation from the Company in December 2018, was he aware of any advice from Attorney Dauer to the Company regarding the benefits of a potential bankruptcy filing. *See* Pl.'s Ex. 1 at ¶66. In early 2019, a meeting was held with Attorney Dauer at which time the general concept of bankruptcy was discussed, but Attorney Dauer did not concur with that option. *See* Doc. No. 235 at ¶203. Not long thereafter, in or around March or April 2019, the Company contemplated bankruptcy, ultimately filing in July 2019 represented by Attorney Robert Lampl. *See* Doc. No. 235 at ¶¶210, 218.

<u>Analysis</u>

To establish a claim of legal malpractice, a plaintiff must prove "employment of the attorney or other basis for a duty; the failure of the attorney to exercise ordinary skill and knowledge; and that the attorney's negligence was the proximate cause of damage to the plaintiff." *See 412 North Front Street Assocs., LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. Ct. 2016).[30] As elucidated by the Supreme Court of Pennsylvania, "[a]n essential element to this cause of action is proof of actual loss rather than a breach of a professional duty causing

---

[29]     *See also* Pl.'s Exs. 2 and 3 (addressing insufficiency of capital from the beginning).
[30]     There is no dispute that Pennsylvania law is applicable to the Plan Administrator's claims.

only nominal damages, speculative harm or the threat of future harm." *See Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998)(citing *Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989)). "Damages are considered remote or speculative only if there is uncertainty concerning the identification of the existence of damages rather than the ability to precisely calculate the amount or value of damages." *Id.*

Within Count I, the Plan Administrator alleges seventeen specific breaches of the duty of care by Defendants. *See* Compl. at ¶112(a)-(q). At oral argument, the Court was advised that three of the seventeen were no longer being pursued,[31] leaving these remaining allegations of failing to fully, properly, and timely disclose, explain, confer, and/or advise the Company with regard to the following:

(1) The negotiations leading up to the execution of the APA, the material terms, conditions, and risks associated with the APA, the interrelation of the APA with the Spirit Transaction, Store Capital Transactions, and Perkins License Agreements comprising the Perkins Franchise Transaction, and the material terms, conditions, and risks of such interrelated agreements and transactions;

(2) The negotiations leading up to the execution of the Store Capital Transactions, the material terms, conditions, and risks associated with the Store Capital Transactions, the interrelation of the Store Capital Transactions with the APA, Spirit Transaction, and Perkins License Agreements comprising the Perkins Franchise Transaction, and the material terms, conditions, and risks of such interrelated agreements and transactions;

(3) The negotiations leading up to the execution of the Perkins License Agreements, the material terms, conditions, and risks associated with the Perkins License Agreements, the interrelation of the Perkins License Agreements with the APA, Spirit Transaction, and Store Capital Transactions comprising the Perkins Franchise Transaction, and the material terms, conditions, and risks of such interrelated agreements and transactions;

(4) Material risks associated with the lack of a financing contingency in the APA;

(5) Material risks associated with the lack of quantification of certain assumed liabilities and financial obligations under the APA;

---

[31]    Counsel confirmed that the claims set forth in ¶112(h), (n), and (o) were no longer being pursued. *See* Oral Argument at 10:29-10:32, 10:48-10:49 A.M.

(6) The importance and necessity of an adequate due diligence process and period in connection with the Perkins Franchise Transaction, and the material risks associated with a lack of same;

(7) The inspection rights which were afforded;

(8) Material terms and risks of that certain $1,750,000 bridge loan from Store Capital which the Company was required to obtain to comply with its financial obligations under the Perkins Franchise Transaction, and specifically, the APA;

(9) Material risks and ramifications of the $1,750,000 bridge loan from Store Capital and the interrelation of the Store Capital bridge loan with the Store Capital forward financing agreement and Perkins License Agreements;

(10) Material terms, obligations, and risks associated with the Perkins License Agreements;

(11) Material risk of inability to fully, properly, and timely perform under its contractual duties and financial obligations of the Perkins Franchise Transaction, including the Perkins License Agreements and Store Capital Transactions;

(12) Material risk of insolvency and inability to pay debts as due from inception of and as a result of the Perkins Franchise Transaction;

(13) The Company's duties and obligations as an insolvent company; and

(14) Insolvency legal advice to maximize value to the Company.

The above allegations are largely intertwined and overlapping.

For the purpose of this Motion, Defendants clarified they are not contesting the first element, which is the existence of the attorney-client relationship between Defendants and the Company. *See* Oral Argument at 10:06 A.M.[32] As to the second element, Defendants acknowledge that the standard of care is generally not appropriate for determination at summary judgment as that is left to the experts at trial. *See id.* at 10:08 A.M. However, Defendants argue that an expert has not weighed in on *all* the claims asserted by the Plan Administrator thus making those specific claims subject to disposition on summary judgment. Two of Defendants' arguments are specifically focused on the third element, causation, and the Court begins there.

---

[32]  Based upon the filings, the scope of the representation will likely be a factual dispute at trial.

21

Alleged Lack of Causation

Defendants first focus on the Plan Administrator's alleged inability to establish that the Defendants' negligence was the proximate cause of damage to the Company. In considering this third element of a legal malpractice claim, case law generally addresses this as a plaintiff's need to prove the "case within a case." *See Kituskie*, 714 A.2d at 1030. This concept is more easily understood and applied in the context of a malpractice case arising out of unsuccessful, underlying litigation. In such a case, a plaintiff is required "to prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case…." *See id*. Notably, the "case-within-a-case" terminology does not neatly fit the facts of a case such as this, where there was no underlying litigation. *See ASTech Int.'l, LLC v. Husick*, 676 F.Supp.2d 389, 402 (E.D.Pa. 2009). Nonetheless, a plaintiff must establish a causal connection between the alleged breach of a professional duty and the claimed loss, such that the plaintiff would have avoided the loss but for the attorney's conduct. *See 412 North Front Street Assocs.,* 151 A3d at 657. Otherwise stated, a plaintiff "must prove that the underlying legal representation would have achieved whatever the plaintiff[] hoped to achieve." *See ASTech*, 676 F.Supp.2d at 402.

In making their arguments regarding a lack of evidence on causation, Defendants characterize their analysis as narrowed to only those claims addressed by the Plan Administrator's standard of care expert, leaving the other allegations to be assessed pursuant to separately stated arguments. *See Defendants' Brief in Support of Motion for Summary Judgment* ("Brief in Support"), Doc. No. 182 at 7. In doing so, Defendants divide their causation-related arguments into two "themes," first addressing the allegations relating to undercapitalization and second

22

addressing the allegations related to the timing of the Company's bankruptcy filing.[33] Notably, the

Plan Administrator's expert identified the following five separate instances where the Defendants'

conduct allegedly fell below the standard of care owed to the Company:

(1) Defendants failed to advise and assist the Company in its due diligence examination and evaluation of the assets it was acquiring;

(2) Defendants failed to advise the Company, prior to the auction, that the so-called Commitment Letter was only an indication of interest that did not commit Store to provide the financing as proposed therein;

(3) Defendants improperly ignored Linaburg's direction to stop bidding at the auction rather than attempting to resolve conflicting directives;

(4) Defendants failed to advise the Company of any right to challenge the post- auction adverse change in the terms of financing, which left the Company with insufficient working capital after Attorney Dauer relied on verbal authorization of a representative of Store at the auction; and

(5) Defendants failed to consider and advise the Company of the merits of exercising its option to reorganize under Chapter 11, rather than acquiesce in the termination of its license to operate and rely instead on its ability to negotiate a viable post-termination temporary license.

*See* Defs.' Exhibit 85 at ¶38. With respect to the first and fourth items, regarding advice on pre-

acquisition due diligence and any post-auction rights to challenge the terms of financing with

Store, neither is specifically addressed by Defendants within this section of their Brief in Support,

and therefore the Court will not independently undertake an assessment of causation with respect

to those. As to the third item, above, Defendants separately address the alleged duty to stop the

bidding elsewhere in the brief rather than in this causation section. *See* Brief in Support at 24-25.

---

[33]    Defendants do not make a clear attempt to connect these two themes with specific duties identified in the expert report despite the statement that Defendants are addressing the absence of causation in respect to this narrowed set of claims. *See* Brief in Support at 7. Nonetheless, the Court does so here.

The remaining issues to address with respect to the causation argument then are the second and fifth items. The Court begins with the latter.

With respect to the fifth item, this alleged breach identified by the Plan Administrator's expert appears to support a portion of the Complaint that was explicitly withdrawn by counsel at oral argument.[34] However, that does not fully resolve this issue as the Plan Administrator did not expressly withdraw what appears to be an overlapping allegation that also covers the alleged failure to advise the Company to file a bankruptcy case sooner.[35] Regardless of whether the on-the-record withdrawal impacts this separately stated, broader allegation, the Court finds it nonetheless must fail. First, it does not appear that the expert report addressed any failure to advise regarding an earlier bankruptcy filing separate from the analysis involving the threat of loss of the license agreements with Perkins, which is clearly the subject matter of the withdrawn paragraph of the Complaint. Second, as addressed in more detail *infra,* even if the expert report is construed to address an alleged breach of duty under the more expansive ¶112(q) of the Complaint, this is precisely the type of breach that would require an expert to opine on causation, which evidence is lacking in this case.

This leaves the Court to address Defendants' causation arguments as they relate to the second item addressed in the expert report. As previously stated, a plaintiff "must prove that the underlying legal representation would have achieved whatever the plaintiff[] hoped to achieve." *See ASTech*, 676 F.Supp.2d at 402. While Defendants may wish to characterize the Company's

---

[34]    Paragraph 112(n) of the Complaint alleges the failure "to provide any, let alone full, proper, and timely, insolvency counsel and advice to [the Company] in respect of the Perkins May 4, 2018 Notice, the material risks of termination of the Perkins License Agreements, and [the Company's] options to prevent termination of and protect and preserve the Perkins License Agreements[.]"

[35]    Paragraph 112(q) of the Complaint alleges the failure "to fully, properly, and timely disclose, explain, confer, counsel, and/or advise [the Company] in respect of insolvency legal advice to maximize value to the Company."

24

goal as merely the acquisition of the Perkins Franchise Chain, viewing the evidence in the light most favorable to the non-moving party, there is evidence that the Company's goal was not limited to merely acquisition but rather acquisition on certain terms. Nonetheless, according to Defendants, the Plan Administrator cannot establish that, but for Defendants' failure to properly advise the Company with respect to the so-called Commitment Letter, the Company would not have been harmed. Specifically, Defendants argue that the Company cannot prove that harm resulted from Defendants' failure to advise of the non-binding nature of the Commitment Letter where evidence otherwise shows that the Company would have known that Store had not made a firm commitment.

Defendants first contend that the Commitment Letter's prominent language made it clear to any reader that the transaction documents could provide substantially different terms thereby making the Company aware of the risks even in the absence of counsel's explanation. However, the facts introduced by the Plan Administrator raise questions as to how a layperson may interpret a document that is otherwise referred to as a commitment. Further, even at the auction, Attorney Dauer represented the document as a commitment to the Court. Thus, the language of the Commitment Letter does not preclude a potential finding in favor of the Plan Administrator on the element of causation.[36]

Next, Defendants assert that the Company should be charged with knowledge based on Frank Kane's understanding from his own experience in the industry. Specifically, Defendants place a great deal of emphasis on Frank Kane's remark that financial terms are not done until cash is wired and documents are executed, and "[i]t's just called business." *See* Defs.' Ex. 3 at 107-08,

---

[36]     The Plan Administrator also points to a Pennsylvania case where summary judgment was denied despite the attorney's contention that the plaintiff signed the contract at issue without reading it and should be precluded from complaining that he was unaware of its contents. *See Hackers Inc. v. Palmer*, 79 Pa. D. & C.4th 485 (Pa. Ct. Com. Pl. 2006).

116. When asked if he was convinced on January 9, 2018, that there was a hard commitment from Store, he testified, "I took the impression, frankly wrongly…that [Store] would deliver the commitments that they made verbally, which was to close the deal that both Bill [Kane] and Ron [Linaburg] believed was sufficient to purchase and properly capitalize the company." *See id.* at 167-68.[37] In other words, Frank Kane's testimony regarding his general experience does not undisputedly establish that the Company knew there was no firm commitment from Store at the time of the auction. In fact, his testimony may be construed to suggest otherwise. Nor is it clear how the opinion of Frank Kane, a financial consultant, could substitute for an attorney's advice regarding legal implications of a particular document.[38]

Likewise, Frank Kane's emails on New Year's Eve and New Year's Day, which demonstrate the lack of a binding commitment at that time, could not conclusively establish that the Company should have known there was no firm commitment by the time of the bankruptcy auction on January 9, 2018, especially as Attorney Dauer undisputedly continued to engage with Store after Frank Kane sent the emails. Furthermore, the deposition testimony of the Store corporate designee fails to establish that the Company was advised regarding the true nature of the Commitment Letter nor could she offer any insight into the discussions between Bennett, of Store, and Attorney Dauer. *See* Defs.' Ex. 13 at 132. Whether the Company would have proceeded

---

[37]    Interestingly, Frank Kane also testified that "[m]y understanding is that Ron [Linaburg] and Bill [Kane] were fully convinced that there was a commitment from STORE Capital at that time." *See* Defs.' Ex. 3 at 167. The Court only points this out, because notably lacking in this section of Defendants' Brief in Support is any citation to testimony from Billy Kane regarding his understanding of the Commitment Letter. The lack of citation is noteworthy considering Defendants rely heavily on the Shareholders Consent providing Billy Kane with decision-making authority for the Company at the auction. Even assuming the validity of the Shareholders Consent, Billy Kane's understanding would appear to be crucial to their argument that the Company proceeded at auction with full knowledge of the lack of a binding commitment. Deposition testimony does appear to exist on this issue. *See* Defs.' Ex. 85 at ¶68 (citing to deposition of Billy Kane). For his part, Linaburg asserts he would not have proceeded with the transaction if he had known of the lack of a firm commitment from Store. *See* Pl.'s Ex. 1 at ¶63.

[38]    Whether Attorney Dauer had such a duty relates to the second element of a legal malpractice claim. This particular item is addressed by way of expert report. *See* Defs.' Ex. 85 at ¶70.

differently upon advice of counsel regarding the terms of the Commitment Letter involves a determination of who the decisionmakers were for the Company and what they knew at the time.[39] For all of these reasons, there are disputed, material facts for trial on this issue.[40]

<u>Alleged Failure of Standard of Care Expert to Draw Causal Connection</u>

To the extent Defendants argue that the failure of the Plan Administrator's standard of care expert to render an opinion on causation is fatal to the claim of legal malpractice, the Court rejects that as a blanket statement. Defendants cite *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. Ct. 1988), for the proposition that, as a general rule, expert testimony is required to establish a claim for professional negligence. The citation, however, supports only that expert testimony was required in that case to establish the second element, which is the proper standard of care. *Id.* at 64. Notably, the ruling in *Storm* was expressly limited to the circumstances presented in that case to permit flexibility as to when an expert is required. *See Id.* at 65. Further, the case does not speak to a requirement of expert testimony to establish the third element of a legal malpractice claim.[41]

---

[39]   The deposition testimony of Linaburg adds another layer for consideration and further muddies the waters. He testified that, prior to the auction in early January, he was asked to and did provide good faith money, and, had he chosen not to do so, he confirmed he could have "tanked the whole thing." *See* Defs.' Ex. 89 at 116-17. This testimony raises the question of whether Linaburg did have the ultimate ability to stop the whole deal *even if* he signed the Shareholders Consent since he could refuse to provide necessary funding. The Court only points this out as another factual issue relevant to the parties' arguments.

[40]   Defendants also contend that it is impossible to conclude that the Company failed due to lack of capital, because it was dysfunctional in too many ways once operational. *See* Brief in Support at 12. However, that argument assumes that the Company would have pursued the acquisition with knowledge of the lack of a binding commitment from Store.

[41]   The same is true for the Defendants' reliance on a number of other cases cited in Defendants' Brief in Support. *See Lentino v. Fringe Emp. Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979)(does not address the need for expert testimony with respect to the causation element); *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985)(where the issue presented was "whether, in moving for summary judgment, appellees were obligated to offer expert evidence on the professional standard of care"); *Cannon v. Rosen*, No. 3398, 2011 Phila. Ct. Com. Pl. LEXIS 264 (Pa. Ct. Com. Pl. Sept. 21, 2011)(observing that "it is well-established that a plaintiff must produce an expert to opine on the defendant attorney's alleged failure to exercise a reasonable degree of care and skill related to common professional legal practice").

At least in some instances, as pointed out by Defendants, expert testimony may be required, particularly in order to prove the case within a case. *See Int'l Land Acquisitions, Inc. v. Fausto*, 39 F.App'x 751, 757-58 (3d Cir. 2002)(finding expert testimony necessary to demonstrate that plaintiff would have won the case within the case had counsel not been negligent, a matter which involved the law of suretyship, agency, and corporate governance); *Campbell v. Picard Losier & Assocs.*, No. 2693, 2007 Phila. Ct. Com. Pl. LEXIS 50, at *20-21 (Pa. Ct. Com. Pl. Feb. 21, 2007)(finding the need for an expert to demonstrate the plaintiff would have prevailed in the underlying action in the face of the insurer's defense); *Olick v. House* (*In re Olick*), 565 B.R. 767, 786 (Bankr.E.D.Pa. 2017)(finding expert testimony was needed to determine whether plaintiff's claims that did not succeed in an arbitration proceeding were meritorious in order to demonstrate that it was counsel's representation that caused the claims to fail). Notably, unlike the foregoing cases, there is no underlying litigation at issue where an expert's legal assessment of the merits of that litigation would be required.

Defendants also rely upon *Weller v. Ransom-Garner*, 338 F. App'x. 249 (3d Cir. 2009). Ultimately, the impact is not as significant as Defendants contend. As observed in that case, the plaintiff had expressly relied upon an expert report to demonstrate causation, which was found to be insufficient. In other words, the Court's decision does not appear to reflect any recognition of a *requirement* under Pennsylvania law that an expert must be used to establish causation in all legal malpractice cases. Rather, the expert report was relied upon for causation and found to be insufficient evidence as it demonstrated only mere suspicion as to whether an event would have occurred but for the concurrence of the defendants. *See* 338 F.App'x at 253. Accordingly, without

28

any clear authority to the contrary, this Court declines to apply a blanket requirement for expert testimony on causation based on the case law cited by Defendants.[42]

Rather, it is more in line with the acknowledged need for flexibility to make a determination on the need for expert testimony based on the circumstances of the case. *See Storm,* 538 A.2d at 65 (observing that "[l]egal malpractice claims run a wide gamut of circumstances" and allowing "flexibility as to when expert evidence is needed"). On this point, Defendants identified within their brief one specific alleged breach that they argue clearly requires an expert's causation analysis and on which the expert expressly stated he did not assess causation. *See* Brief in Support at 16-17. Defendants argue that an expert would be required to address causation specifically with respect to the Company's prospect of success had it filed its Chapter 11 case sooner, in May 2018, when the threat of losing the license to operate as Perkins was looming. The expert report characterizes this as "a complex, fact-based exercise." *See* Defs.' Ex. 85 at ¶87.

The Court agrees with Defendants' argument on this specific point as an expert would be required to address the likely outcome of an earlier bankruptcy filing to establish any alleged harm caused by a delay in filing. In other words, the Plan Administrator did not produce evidence in

---

[42] Defendants also contend that Pennsylvania Rule of Civil Procedure 1042.3, which imposes a certificate of merit requirement in actions alleging that a licensed professional deviated from an acceptable professional standard, supports their position that expert testimony is required to show causation. On this point, the Third Circuit's decision addressing the rule with respect to a medical malpractice claim is contrary to the Defendants' contention. *See Wilson v. United States*, 79 F.4th 312, 317-18 (3d Cir. 2023)(finding no basis to conclude that "Rule 1042.3 is itself an element or evidence of a malpractice claim or otherwise part of the liability analysis" and that such a rule "must not 'abridge, enlarge nor modify the substantive rights of any litigant'"). Although the Third Circuit was addressing the rule in the context of the Federal Tort Claims Act's incorporation of state law, the conclusion appears equally applicable to Defendants' specific argument here, where the Court found "Rule 1042.3 'neither modifies [the common law] standard of liability nor elucidates the types of evidence required to establish the standard, its breach, or causality.'" *Id.* at 319. To the extent the Court in *Wilson* distinguishes diversity jurisdiction cases and proceedings "related to" bankruptcy cases from claims under the FTCA, *see id.* at 319 n.5, even Defendants acknowledge in their *Reply Brief in Support of Motion for Summary Judgment* that it appears Pennsylvania's certificate of merit requirement no longer applies to cases filed in federal court. *See* Doc. No. 249 at 20. *See also DiFraia v. Ransom*, 171 F.4th 622, 633 (3d Cir. 2026)(citing *Berk v. Choy,* 607 U.S. 187 (2026)).

support of the allegation that, but for Defendants' failure to advise the Company to file a

bankruptcy case at an earlier time, the Company would not have incurred damages. However, as

previously noted, the Plan Administrator withdrew the claim of failure to advise the Company to

file bankruptcy sooner, specifically eliminating from consideration ¶112(n) of the Complaint. To

the extent the Plan Administrator sought to proceed with ¶112(q), which seems to overlap with the

allegations in ¶112(n), the Court reaches the same conclusion. As Defendants did not identify and

analyze any other specific allegations of breach requiring expert testimony on causation, the Court

will not undertake the analysis for them.

Alleged Failure to Offer Expert Support for Standard of Care on Certain Claims

Defendants' next argument deals with the second element of a legal malpractice claim. The

question of whether expert evidence is required to establish a breach of the standard of care in

legal malpractice cases is specifically addressed in *Storm v. Golden,* 538 A.2d 61. In that case, the

Court recognized "that when dealing with the higher standards attributed to a professional in any

field a layperson's views cannot take priority without guidance as to the acceptable practice in

which the professional must operate." *See id.* at 64. "Expert testimony becomes necessary when

the subject matter of the inquiry is one involving special skills and training not common to the

ordinary lay person." *Id.* The holding, however, permitted flexibility as follows:

> We expressly limit our holding to the present circumstances in order to allow
> flexibility as to when expert evidence is needed. Legal malpractice claims run a
> wide gamut of circumstances from clear cut claims of a breach of an attorney's duty
> for allowing the statute of limitations to run against the former client's cause of
> action to the complex determination required of a claim of breach of duty involving
> the attorney's choice of trial tactics in which a layperson's judgment obviously
> requires guidance. Between these two extremes lie a myriad number of legal
> malpractice actions for which the necessity of expert evidence to establish the
> attorney's duty and breach thereof will not be readily evident without careful
> examination of the factual circumstances upon which they arise. Generally, the
> determination of whether expert evidence is required or not will turn on whether

30

the issue of negligence in the particular case is one which is sufficiently clear so as to be determinable by laypersons or concluded as a matter of law, or whether the alleged breach of duty involves too complex a legal issue so as to warrant explication by expert evidence.

*See id.* at 65 (footnote omitted).

In *Storm*, the issue before the Court was whether an attorney breached his duty in connection with the representation of a client in a real estate transaction. While the appellant argued "that the sale of real estate is an elementary and non-technical transaction which requires only simple common sense[,]" the Court found the appropriate consideration was not the alleged simplicity of the transaction but rather assessment of "[w]hether an attorney failed to exercise a reasonable degree of care and skill related to common professional practice in handling a real estate transaction…." *Id.* at 65. Ultimately, the Court concluded that such "a question of fact [was] outside the normal range of the ordinary experience of laypersons." *Id. See also 412 North Front Street*, 151 A.3d at 660-61)(rejecting the argument that allegations of overbilling and improper billing practices were so straightforward to be within the understanding of a jury without expert explanation); *Javaid v. Weiss*, No. 4:11-CV-1084, 2013 WL 5351083 at * 13 (M.D.Pa. Sept. 23, 2013)(distinguishing from the simple cases where lack of skill is obvious, such as where an attorney misses a filing deadline, fails to inform of settlement offers, or engages in financial transactions with a client, and finding the plaintiff's failure to produce expert testimony to support his claims demonstrated inability to carry his burden and thus summary judgment was appropriate).

In this case, it is clear from the report that the Plan Administrator's expert reviewed the various transactions leading to the acquisition of the Perkins Franchise Chain, which he characterized as integrated and co-dependent, as well as the aftermath. *See* Defs.' Exhibit 85 at ¶¶32-34. He set forth the standard of care as follows: "A reasonably prudent lawyer practicing in

31

Pennsylvania, in the context of the acquisition of a business enterprise and related assets, has the duty, at every stage of the representation, to fully, properly and adequately advise his or her client of their client's rights, obligations, risks, and available alternatives." *See id.* at ¶37. He then offered his opinion of how Defendants fell short of that standard of care in five specific ways. *See id.* at ¶38.[43]

It is undisputed that the report does not cover every alleged breach in the Plan Administrator's Complaint, and Defendants argue that the Plan Administrator cannot succeed on those other claims without expert testimony supporting a duty and breach.[44] While the Plan Administrator contends that expert testimony is not required where there is "blatant legal malpractice," the Plan Administrator makes little effort to explain how the remaining allegations fall into what seems to be the exception to the general rule. *See* Doc. No. 245 at 27-28.[45] Further, the need for expert testimony seems particularly necessary here to explain an attorney's role in a series of complex transactions, which raise issues of corporate governance, and where a significant part of the dispute requires a distinction to be drawn between the role of legal counsel and financial

---

[43]      As stated, *supra*, the five identified breaches are as follows: (1) Defendants failed to advise and assist the Company in its due diligence examination and evaluation of the assets it was acquiring; (2) Defendants failed to advise the Company, prior to the auction, that the so-called Commitment Letter was only an indication of interest that did not commit Store to provide the financing as proposed therein; (3) Defendants improperly ignored Linaburg's direction to stop bidding at the auction rather than attempting to resolve conflicting directives; (4) Defendants failed to advise the Company of any right to challenge the post-auction adverse change in the terms of financing, which left the Company with insufficient working capital after Attorney Dauer relied on verbal authorization of a representative of Store at the auction; and (5)      Defendants failed to consider and advise the Company of the merits of exercising its option to reorganize under Chapter 11, rather than acquiesce in the termination of its license to operate and relying instead on its ability to negotiate a viable post-termination temporary license.

[44]      Defendants specifically identify the claims in the Complaint at ¶112(a)-(e), (h)-(*l*), and (o)-(p). *See* Brief in Support at 19. Of these, (h) and (o) are no longer being pursued by the Plan Administrator.

[45]      Nor has the Plan Administrator established that the remaining claims are the types that the Rules of Professional Conduct may sufficiently inform the standard of care in lieu of expert testimony. *See Live Nation Ent., Inc. v. Weber Gallagher Simpson Stapleton Fires & Newby, LLP*, No. 2361 EDA 2023, 2024 WL 4785011, at *7 & n.10, 2024 Pa. Super. Unpub. LEXIS 2857, at *18 & n.10 (Pa. Super. Ct. Nov. 14, 2024)(addressing a malpractice action based on a breach of fiduciary duty).

consultant. Accordingly, the Plan Administrator has not come forward with evidence in support of a breach of the standard of care on any of the claims that are not included in the expert report rendering summary judgment appropriate in favor of Defendants on these unaddressed alleged breaches.[46]

Alleged Failure to Provide Business Advice

Defendants argue that they cannot be held liable for claims that fall under the umbrella of financial or business advice. The Plan Administrator does not disagree. The dispute comes down to whether certain advice that allegedly should have been given constitutes legal advice or business advice. In the Court's view, this dispute is largely resolved through the role that an expert plays in these types of proceedings. For example, in this case, the expert identified the standard of care and how the Defendants allegedly breached that standard in relation to both examples raised by Defendants: (1) advice regarding pre-acquisition due diligence and (2) advice regarding the terms

---

[46]   Perhaps suspecting this outcome, the Plan Administrator seeks the opportunity to supplement the expert report if the Court deems it necessary. However, the arguments presented are simply insufficient on this record for the Court to grant leave to supplement. Unlike the case raised at oral argument, this request does not appear to be a "true supplementation (e.g., correcting inadvertent errors or omissions)" as opposed to an "attempt[] to avert summary judgment by supplementing an expert report with a new and improved expert report." *Peronis v. United States*, No. 2:16-cv-01389, 2018 WL 4740170, at *6, 2018 U.S. Dist. LEXIS 169696, at *16-17 (W.D.Pa. Oct. 2, 2018)(quoting *McDaniel v. Kidde Residential & Com.*, No. 2:12-cv-1439, 2015 WL 6736811, at *1 (W.D.Pa. Nov. 3, 2015)). Further, in the *Peronis* case, the Court had the supplementation to review in making its determination, and the filing was a one-sentence supplement "best viewed as a minor clarification." *See* 2018 WL 4740170, *8-9, 2018 U.S. Dist. LEXIS 169696, at *22. What the Plan Administrator seeks to accomplish here appears to be a wholly different endeavor, which the Court, in its discretion, does not find appropriate based on the arguments raised. Further, if these additional breaches are as obvious, even to a layperson, as the Plan Administrator contends, then it is somewhat baffling that the expert who reviewed the record failed to identify them. As observed by the Court in *Katz v. Beebe Healthcare*, "[c]ourts have generally favored giving a party at least one opportunity to cure *a technical inadequacy*[.]" *See* No. 22-625-WCB, 2025 WL 1207117, at *2, 2025 U.S. Dist. LEXIS 78954, at *5 (D.Del. Apr. 24, 2025)(emphasis added). However, this is not the type of cure sought here. Significantly weighing against granting such relief is the complete absence of a reasonable explanation for the failure to provide a complete report in the first instance. This is simply not the same as granting summary judgment based on some *technical* failure.

33

of the Commitment Letter. Accordingly, as Defendants indicated at the start of oral argument, this dispute with regard to standard of care will be a battle for the experts at trial.

Alleged Failure to Stop the Bidding[47]

At the outset, the Court notes the factual dispute regarding whether Linaburg actually gave any instruction to stop bidding at the auction. However, per the Defendants, regardless of whether he did so, Defendants cannot be held liable as a matter of law for failure to follow the instruction. In support of this conclusion, they rely solely on Pennsylvania's Rule of Professional Conduct 1.13, which provides "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." *See* Rule 1.13(a). Per Defendants, Billy Kane, as president of the Company and by virtue of the Shareholders Consent, acted as the Company's duly authorized constituent at the auction.

While Billy Kane was undeniably the president of the Company, it does not appear that Defendants argue that fact standing alone, as a matter of law, was sufficient to permit him to bid at his own discretion at the auction.[48] Further, as amplified in the comments to Rule 1.13, a president of a corporation is not the *only* constituent; rather, the comment identifies officers, directors, and shareholders as well. Thus, the question, at least in applying the rule identified by Defendants, is who was acting as the Company's duly authorized constituent. To the extent

---

[47]    In a single sentence without citation to any rule or standard, Defendants assert that "[t]his theory of liability is not in the Complaint and therefore, should not be entertained by the Court as a reason to perpetuate this case against [them]." *See* Brief in Support at 24. Without more, the Defendants then go on to address the merits of the Plan Administrator's contention on this alleged breach. The Complaint did, however, allege that Defendants acted in a way that reflected undivided loyalties to Billy Kane and provided conflicted legal advice in relation to the entirety of the Perkins Franchise Transaction. *See* Compl. at ¶¶5, 8. The Defendants did not provide argument to address why this should be deemed insufficient to cover the allegations at the auction.

[48]    To the extent Defendants cite to the Plan Administrator's deposition testimony, affirming that it would generally be fair and proper for an attorney to take direction from a company's president when representing a company, this certainly does not address the specific factual scenario about the appropriate conduct of an attorney where there are conflicting instructions being provided.

Defendants argue that Billy Kane was authorized to act pursuant to the Shareholders Consent, the consent itself is subject to dispute in this case. *See* Doc. No. 250 at ¶¶47-49.[49] Further, the Plan Administrator has supported this alleged breach of a professional duty with expert testimony on the standard of care, which is sufficient to permit this allegation to survive summary judgment.[50] This conclusion is also supported by Defendants' acknowledgment that, as to the element of standard of care, that is generally an issue for the experts at trial. *See* Oral Argument at 10:08 A.M.

Statute of Limitations

This is the second time the statute of limitations has been raised by the Defendants in this proceeding. By way of a motion to dismiss, Defendants previously argued that the action was time-barred as it was filed outside of the two-year statute of limitations under applicable Pennsylvania law. As more fully explained in the Memorandum Opinion dated July 25, 2022, this Court denied the motion and found the Plan Administrator was entitled to the benefit of the extension of time provided in 11 U.S.C. §108(a) due to his status as representative of the estate under 11 U.S.C. §1123(b)(3)(B). Now, Defendants assert information obtained through discovery establishes that the Plan Administrator is not fulfilling that role for the benefit of all creditors through the pursuit of this adversary proceeding. Instead, Defendants contend the Plan Administrator is pursuing the action for the benefit of a single creditor, who happens to be L-Four.[51] As evidence of this assertion,

---

[49]     With respect to any challenge to the Shareholders Consent, the parties have not briefed the associated legal issues. While Defendants assume its validity in the face of Linaburg's alleged revocation, the Plan Administrator clearly relies on Linaburg's ability to revoke such authority by voicing his objection at the auction. The Court does not resolve the issue here.

[50]     The Plan Administrator's standard of care expert expresses the following opinion, despite any potential authority granted to Billy Kane through the Shareholders Consent: "It is clear beyond peradventure that a critical role of an attorney for a closely held corporation is to endeavor to resolve any fundamental disagreements between controlling shareholders before acting on the direction of only one of them, even if that shareholder is legally empowered to act on behalf of the corporation." *See* Defs.' Ex. 85 at ¶80.

[51]     L-Four filed claims in the bankruptcy case. *See* Pl.'s Ex. 1 at ¶62.

Defendants point to the Funding Agreement entered into between the Plan Administrator and L-Four. *See* Defs.' Ex. 83.

The Court does not agree that the Funding Agreement by its terms strips the Plan Administrator of his status as representative of the estate. The agreement appears to reflect nothing more than the Plan Administrator's attempt to obtain some benefit to the estate where he otherwise would not have the funds necessary to continue to pursue litigation. *See* Funding Agreement at 2. The Court rejects Defendants' conclusion that the agreement renders the Plan Administrator's role superfluous. Notably, the Defendants fail to quote the entirety of the provision from which they draw this conclusion. The agreement provides:

> The Plan Administrator will conduct the Estate's Litigation in accordance with the reasonable direction and desires of L-FOUR. In the event L-FOUR directs action which Plan Administrator believes is contrary to its fiduciary duties or duties required as a Plaintiff, he may decline to follow such direction, unless he is provided with a formal Opinion of L-FOUR's Counsel (reasonably acceptable to Plan Administrator) supporting the action so directed.

*See* Funding Agreement at 4. Defendants have cited to no case law that would transform this action, based solely on the Plan Administrator's agreement to obtain funding and a chance to provide some benefit to the estate, into the equivalent of an action brought by a creditor. Therefore, this Court declines to reach a different conclusion on this renewed argument on statute of limitations grounds.

Vicarious Liability

Defendants' final argument is that Count II, which is a claim of vicarious liability against the law firm, cannot survive where there is no direct claim for legal malpractice. However, because direct claims will survive this Motion, so too can the potential for vicarious liability.

Conclusion

Based on the foregoing, Defendants' Motion must be granted in part and denied in part. The Plan Administrator failed to identify evidence by way of expert report on the standard of care for every allegation of professional misconduct within the Complaint or otherwise establish that such expert evidence was unnecessary. In addition, with respect to the alleged failure to file a bankruptcy case sooner, that claim has been withdrawn or otherwise fails due to lack of proof on the element of causation. The remaining four allegations of professional misconduct identified in the expert report shall proceed to trial. An appropriate Order will be entered.

Date: August 12, 2026

__/s/ Carlota M. Böhm_____
Carlota M. Böhm
United States Bankruptcy Judge

SIGNED
8/12/26 2:52 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

37